UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| BESPOKE REAL ESTATE LLC and BESPOKE LUXURY MARKETING LLC, | **COMPLAINT** |
| Plaintiffs, |  |
| -against- | Docket No. |
| PRESTON KAYE and LAKE FARM GROUP INC., | **JURY TRIAL DEMANDED** |
| Defendants. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Plaintiffs Bespoke Real Estate LLC and Bespoke Luxury Marketing LLC (collectively, "Bespoke"), by their attorneys, Garfunkel Wild, P.C., for their Complaint against Defendants Preston Kaye and Lake Farm Group Inc. ("Lake Farm"), allege that:

## INTRODUCTION

1.     Bespoke is an industry-leading real estate brokerage firm catering to the ultra-luxury real estate market, as defined by properties valued in excess of $10 million.  The success of Bespoke is due, in no small measure, to the highly confidential and proprietary information that it maintains and has cultivated over the course of years and at great expense.  This includes, for example, information related to potential buyers and sellers and their purchasing and sales preferences and history, the mortgage status of specific properties, proprietary data collection and marketing methodologies, and other confidential information that is not readily available to the public at large.

2.     Defendant Preston Kaye, an independent contractor of Bespoke, had access to substantially all of this information due to the nature of his position with the company, which was primarily a business development role.

1

3.      On October 25, 2019, Kaye was terminated from his independent contractor relationship upon a charge of serious misconduct, including assaulting a Bespoke employee and verbally threatening to steal Bespoke's confidential information, trade secrets, and other intellectual property.

4.      Following his termination, Bespoke discovered that Kaye had, in fact, deliberately and systematically procured Bespoke's trade secrets and other highly confidential and proprietary information during the course of his affiliation with Bespoke.  Kaye accomplished this theft by, among other methods, forwarding documents from Bespoke's computers to his personal email and iCloud accounts.[1]  Kaye also created charts and other documents that were authored using Bespoke's proprietary information, and forwarded those documents to his personal email account as well.

5.      Any dissemination of the information taken by Kaye would cause long-lasting, irreparable harm to the business that Bespoke spent years developing, and could subject Bespoke to significant liability from third-party vendors.

6.      Recently, Kaye began working for a real estate broker who is an active and aggressive competitor of Bespoke.  Upon information and belief, Kaye has used, continues to use, and/or intends to use Bespoke's confidential information and trade secrets to the benefit of himself and/or this broker.

---

[1]      iCloud is a cloud-based storage and cloud computing service offered to the users of Apple products. Bespoke uses Apple computers at its offices.

2

7.    In addition, Kaye deliberately destroyed hundreds, if not thousands, of the documents that he created for or on behalf of Bespoke over the course of his independent contractor relationship, causing even further financial harm to the company.

8.    With this lawsuit, Bespoke seeks an award of compensatory, exemplary, and punitive damages for the losses that it has suffered, and will in the future suffer, as a result of Kaye's wrongful acts.    Bespoke also seeks an injunction prohibiting Kaye from using or disclosing its confidential information and trade secrets and mandating that he submit to a forensic analysis of all of his devices and his iCloud account to confirm that he deleted all confidential information and documents that he wrongfully retrieved and/or retained from Bespoke. Finally, Bespoke seeks an Order, pursuant to the Defend Trade Secrets Act, providing for the seizure of any of Kaye's devices or accounts that contain Bespoke's confidential information and trade secrets.

## PARTIES

9.    Bespoke Real Estate LLC and Bespoke Luxury Marketing LLC are New York limited liability companies with their principal place of business located in Water Mill, New York.

10.    Upon information and belief, Preston Kaye is an individual residing in Sag Harbor, New York.

11.    Upon information and belief, Lake Farm is a New York business corporation owned and operated by Kaye, with its principal place of business located in East Hampton New York.

3

5485068v.16

## JURISDICTION AND VENUE

12.    This Court has federal question jurisdiction over Bespoke's claim under the Defend Trade Secrets Act pursuant to 28 U.S.C. § 1331.

13.    This Court also has supplemental jurisdiction over Bespoke's state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in this District in accordance with Paragraph 12 of the Independent Contract Agreement, dated April 16, 2019, between Bespoke and Defendants, which states, in pertinent part:  "The parties hereto irrevocably consent to the . . . exclusive venue of the United States District Court for the Southern District of New York and of the courts of the State of New York located in the County of New York."

## FACTUAL BACKGROUND

Bespoke's Business Model

15.    Bespoke is a Hamptons-based real estate brokerage firm specializing in properties with a list price at or above $10 million.  Bespoke currently manages a listing portfolio with a collective value in the amount of approximately $1.6 billion.

16.    Bespoke is currently in the process of opening a New York City office, and is planning to open additional offices in other key luxury markets, such as Miami and Palm Beach, Florida, in order to serve an existing and future client base.

17.    Bespoke's competitors are all traditional real estate brokerage firms, whose agents work independently or in separate "teams."  Under this model, agents compete with one another

4

for listings and buyers and do not share information among themselves, or with their principal broker, even though they are technically employed by the same brokerage firm.

18.    Bespoke does not operate as a traditional real estate brokerage firm.  Two key factors distinguish Bespoke from its competitors:

19.    First, all of Bespoke's agents work directly out of its corporate office, which implements and manages all aspects of procurement, onboarding, marketing, management, transactions, and communications.

20.    Second, Bespoke uses quantitative data science to identify and generate business by compiling, managing, and utilizing historic and real-time data on relevant properties and current and prospective clients through proprietary algorithms.  The results collected from Bespoke's data algorithms are then generated into confidential reports, tracking sheets, models, and logs, which are utilized solely within the company to further its business and the interests of its clients.

21.    Bespoke is able to use this data-driven approach precisely because of its "direct to client" business model.  Upon information and belief, Bespoke's competitors are unable to replicate Bespoke's business model because their agents operate independently and do not share information with one another.

Bespoke's Confidential
Information and Trade Secrets

22.    Given its business model, Bespoke has invested substantial time and resources on developing proprietary methodology for gathering and organizing data that is critical to its business operations.

5

23.     Among other things, Bespoke uses its proprietary methodology to develop lists, models, and programs that contain and track information regarding high-value properties, high-net-worth individuals who are potential and active buyers and sellers of those properties, and historic real estate transactions.

24.     Bespoke also developed a "KMZ" file, which contains proprietary data that Bespoke has collected regarding current and prospective clients and relevant properties and visually overlays it into Google Earth.

25.     Bespoke uses all of this data – which is not readily available to the public or its competitors – to gain access to, and business from, some of the wealthiest individuals in the world.

26.     Bespoke also uses its "KMZ" file as a powerful visual tool for its clients, as it allows them to contextualize properties in the Hamptons market. This is significant because the Hamptons real estate market is not easily susceptible to the metrics typically applied in other markets, such as price per square foot.

27.     Bespoke has invested between $1,000,000 and $1,900,000 over five years on developing its confidential data and proprietary methodology. Upon information and belief, this is a significantly larger capital investment than those made by Bespoke's competitors.

28.     The methodology and data that Bespoke has developed have given it a significant competitive advantage in the Hamptons market. In fact, in the five short years since its founding, Bespoke has more than once ranked as the top brokerage firm among properties exceeding $10 million in value and the top brokerage firm for total sales volume.

6

29.    Because of this competitive advantage, and the significant capital investment that Bespoke has made, Bespoke takes substantial measures to keep its proprietary methodology and data confidential.  Specifically, Bespoke protects its confidential and competitively sensitive documents by, among other things, password protecting them, restricting their access only to a small subset of employees and contractors, and restricting their access to the desktop computers owned by Bespoke and located at Bespoke's offices.

The Potential Impact on Bespoke
from the Disclosure of Its
Confidential Information and Trade Secrets

30.    In light of Bespoke's meteoric rise in the ultra-luxury real estate market, its competitors have been actively trying to gain access to its confidential information and trade secrets.

31.    If Bespoke's competitors are able to gain access to its confidential data and propriety methodology, then Bespoke would lose its competitive advantage, and its market share would either evaporate or be greatly diminished.  This would, in turn, diminish the value of Bespoke itself.

32.    Specifically, competitors could use the confidential data to gain access to Bespoke's actual and prospective clients and steer their business away from Bespoke.

33.    Competitors would also be able to use Bespoke's proprietary methodology in order to gather new data, which it would use to unfairly compete with Bespoke for business.

5485068v.16

34.    This would have a catastrophic impact on Bespoke's existing business in the Hamptons, and on Bespoke's planned expansion into other luxury markets, including New York City and South Florida.

35.    In addition, Bespoke is in active negotiations with several large brokerage firms to provide proprietary marketing and management services. If these firms were able to gain access to Bespoke's confidential data and proprietary business methodology, then these services would effectively become worthless.

36.    Moreover, some of the confidential information and data used by Bespoke is licensed from its vendors and subject to severe non-disclosure agreements. If this information were to be revealed to a competitor, it could expose Bespoke to liability under those agreements.

Kaye's Independent Contractor Relationship with Bespoke

37.    Kaye began working at Bespoke on or about March 30, 2016 as an independent contractor.

38.    Because of his compensation and bonus structure, Kaye opted to be paid through Lake Farm, a corporate entity owned and operated by him.

39.    At the time that Kaye joined Bespoke, he had no experience in the real estate market. He gained all of his knowledge, experience, and contacts within the field purely as a result of his work with Bespoke.

40.    During the entire term of his independent contractor relationship, Kaye worked in a corporate capacity, with active involvement in the management of Bespoke's existing property

8

listings, the procurement of new listings, and the marketing of properties to Bespoke's existing and prospective clients.

41.    During his approximately 3 and a half years at Bespoke, Kaye rose through the company's ranks, ultimately becoming the Listing Procurement Manager.

42.    Kaye did not serve as a real estate agent for Bespoke, and had little to no direct involvement in the purchase or sale of any properties. Although he was required to become a licensed real estate salesperson as a condition of his independent contractor relationship, Kaye's primary responsibilities were to manage and enhance Bespoke's Listing Procurement Department.

43.    Due to the nature of his position at Bespoke, Kaye was provided access to nearly all of the company's intellectual property and other protected information, including, but not limited to, lists of client purchasing and sales history and preferences, prospective and active client activity reports, client asset ownership reports, and other identifying information and data-sets that Bespoke uses to procure listings or to match a particular client with a particular property.

Kaye Enters into an Independent Contractor
Agreement and Covenant Agreement with Bespoke

44.    Kaye's relationship with Bespoke was memorialized in an Independent Contractor Agreement (the "Contractor Agreement"). The most recent version of the Contractor Agreement, dated May 6, 2019, is annexed as Exhibit A.

45.    Exhibit A to the Contractor Agreement defines the scope of Kaye's work for Bespoke. Among other things, Kaye was hired to: (a) manage and enhance Bespoke's Listing

9

Procurement Department; (b) work with Bespoke principals to fine tune Bespoke's systems and logistics related to business generation; and (c) assist with miscellaneous corporate and sales tasks, as needed. *See* Exh. A to Exhibit A.

46.    Kaye's compensation for his services included a fixed Statement of Work ("SOW") fee, as well as commissions that were based primarily upon Bespoke's overall market performance. *See* Exhs. A & B to Exhibit A.

47.    In light of the confidential documents and information to which he had access, the Contractor Agreement also clearly and definitively sets forth the parameters by which Kay can use Bespoke's confidential information and trade secrets, as well as the limits of such use, including the immediate return of any confidential information in Kay's possession at the end of the parties' affiliation.

48.    Paragraphs 8 and 10 of the Contractor Agreement state:

> Any trade secrets, non-public or confidential information of whatever nature related to Bespoke, its holding, subsidiary, affiliated or associated companies or their business, affairs, finance or customers, which [Kaye] shall prepare, receive, generate, or obtain any time during [his] engagement with Bespoke, shall be the property of Bespoke.    [Kaye] shall use such trade secrets or confidential information only in the normal course of [his] duties as directed by Bespoke supervisors and absolutely not for [his] private or personal use or disclosure of the same to any third person whether for money, other consideration or otherwise any time during or after [his] engagement with Bespoke.    Upon termination of [his] employment with Bespoke, [Kaye] must return immediately to Bespoke all property and documents belonging to Bespoke or relating to the business or affairs of any of Bespoke's holding, subsidiary, associated or affiliated companies.

Exhibit A.

49.    Likewise, Paragraph 13 of the Contractor Agreement provides that upon termination, Kaye "shall deliver to Bespoke all property, which is the property of Bespoke or

10

related to Bespoke's business," which expressly includes, among other things, "records, notes, data, memoranda," and "models," and submit to an "immediate in-person meeting with Bespoke's management to affect the removal or any prior emails related to Bespoke from any/all devices of Bespoke and [Kaye]." *Id.*

50.    Furthermore, under Paragraph 14 of the Contractor Agreement, Kaye was required to conduct "all real estate business related electronic correspondence" via "Bespoke's email platform." *Id.*

51.    Kaye was also required to enter into a "Confidential Information, Work for Hire and Covenant Agreement" (the "Covenant Agreement") as part of his engagement with Bespoke. A true and correct copy of the most recent version of the Covenant Agreement, dated May 6, 2019, is annexed as Exhibit B.

52.    The Covenant Agreement contains similar, if not more stringent, provisions regarding Bespoke's confidential information and trade secrets. That agreement broadly defines "Confidential Information" to include:

> [A]ny information that is generally not known to the public, such as trade secrets, business practices, processes, systems, technology, techniques, materials, data, product designs, plans, prices, marketing techniques, costs, discounts, business affairs, future plans, customer and client names, databases, transactions, methods, manner of operations, CRM technology and data, contract information, real estate brokerage techniques, trade dress, creative, strategic, technical, business and financial information, future business plans and/or information relating to its vendors, suppliers, clients, prospective clients, counterparts, contractors, and employees. For example, the following could constitute Confidential Information: electronic files, financial records, software, contract documents, client lists, client contacts, employee lists, editorial, marketing and/or creative information, creative concepts and strategies, business planning and projections, passwords, training materials and power point presentations, slide decks or emails that reflect private or proprietary information relating to [Bespoke], its vendors, suppliers, clients, prospective clients, counterparts contractors and employees.

11

Exhibit B, ¶ 1.

53.    The Covenant Agreement makes absolutely clear that "confidential information and or materials that were previously prepared by [Kaye] while employed at [Bespoke], while performing work for [Bespoke], or had come into [Kaye's] possession, custody or control " over the course of his engagement "is and will remain the property of [Bespoke]." *Id.*

54.    Kaye also expressly agreed, in Paragraph 1 of the Covenant Agreement, that he "will not at any time or in any manner, either directly or indirectly, use (for [his] commercial advantage, for any third party's commercial advantage, or for [Bespoke's] commercial disadvantage), divulge, disclose, or communicate any Confidential Information to any third party without the prior written consent of [Bespoke]." *Id.*

55.    Likewise, Kaye agreed, upon request by Bespoke at any time, to "immediately return . . . all written or descriptive materials of any kind that constitute or contain Confidential Information, in any medium (hardcopy or electronic) in [his] possession, custody, or control, together with all copies of such items." *Id.*

56.    Kaye also acknowledged that he had been, and would continue to be, granted "unique and extraordinary" access to Bespoke's confidential information and trade secrets, and that the same "gravely affect[] the effective and successful conduct of [Bespoke's] business and goodwill." Exhibit B, ¶ 1.

57.    Paragraph 2 of the Covenant Agreement imposes additional obligations upon Kaye to protect Bespoke's confidential information and trade secrets, including, but not limited to, (a) the obligation to take reasonable steps to preserve their secrecy, such as by password

protecting sensitive documents; and (b) to inform Bespoke "in the event [he] or others have revealed it improperly or otherwise misused it." Exhibit B.

58.    Under Paragraph 2 of the Covenant Agreement, Kaye is expressly prohibited from, among other things, "download[ing], transfer[ring], copy[ing], or retain[ing]" confidential and protected information "after leaving [Bespoke's] employ." *Id.*, ¶ 2.

59.    Finally, in Paragraph 6 of the Covenant Agreement, the parties agreed that Kaye's "actual or threatened material breach of this Agreement is likely to result in irreparable harm to [Bespoke] and/or its clients, for which money alone would be an insufficient remedy." Exhibit B. As such, the parties agreed that Bespoke would, in such circumstances, be "entitled to a temporary restraining order and/or preliminary or permanent injunction to prevent [Kaye's] continued breaches, without any requirement to post a bond or other security."

Kaye Is Terminated from His
Independent Contractor Relationship with Bespoke

60.    On October 25, 2019, Kaye verbally and physically assaulted one of his co-workers while at Bespoke's offices. Among other things, Kaye made threatening gestures toward his co-worker, addressed her with vulgar slurs and expletives, and poured coffee over notebooks that were on her desk.

61.    During that altercation, Kaye stated to the co-worker that he would be leaving Bespoke in a few weeks and that he was "taking everything" with him.

62.    Specifically, Kaye stated: "Only a few more weeks and I'm out of here. I'm taking everything with me on a hard drive. It's happening right now. They just need to pay me my money and I am out of here."

13

63.     When the co-worker left Bespoke's offices and retreated to her car, Kaye continued the dispute via text message. In the course of that discussion, the co-worker informed Kaye that it was "illegal and wrong to take company property."

64.     Kaye did not deny his intention to steal Bespoke property, but merely demanded that the discussion not be held via text message.

65.     Bespoke determined that Kaye's behavior constituted "serious misconduct" under Paragraph 6(b) of the Contractor Agreement and immediately terminated Kaye for cause.

66.     At an exit interview the following day with Bespoke's owners, Zachary Vichinsky and Cody Vichinsky, Kaye admitted that he told the co-worker that he was "taking everything" and that he was backing up company information on a hard drive.

Bespoke Discovers Kaye's Theft of
Trade Secrets and Other Wrongful Conduct

67.     Based on his threat to "tak[e] everything," Bespoke conducted an internal investigation of Kaye's office computer. Bespoke discovered that Kaye had:

(a)     Conduced business through the personal email address "preston.bespoke@gmail.com," which mimics Kaye's Bespoke-issued email address: "preston@bespokerealestate.com";

(b)     Logged into his personal Gmail account on his desktop computer and sent various confidential documents to that account, including, but not limited to, the "KMZ" file and various non-public documents regarding property transactions;

14

(c)     Improperly retrieved the username and password for Bespoke's highly confidential property database – which were not otherwise provided to him – and sent them to his personal Gmail account; and

(d)     Continuously synced confidential company documents on his Bespoke computer to his personal iCloud account.

68.     Through his copying and retention of emails and documents from Bespoke, Kaye has improperly retained access to nearly all of Bespoke's confidential information and trade secrets, which include, but are not limited to, current and prospective client lists, client profile information and activity reports, information regarding direct marketing campaigns, and non-public data regarding the Hamptons market and local properties.

69.     Pursuant to Paragraph 13 of the Contractor Agreement and Paragraph 1 of the Covenant Agreement, Bespoke demanded that Kaye come to its offices for an in-person meeting to effect or confirm the deletion of all of its confidential and proprietary documents from all of his devices. *See* Exhibits A & B.

70.     As it had determined that Kaye had improperly taken and/or retained various confidential documents from Bespoke, Bespoke also demanded that he submit to a forensic analysis of his various devices and iCloud account.

71.     Kaye agreed to come to Bespoke's offices with his electronic devices, including his cell phone, and to provide Bespoke with the devices and the passwords to them, as well as the password to his iCloud account.

15

72.     On November 8, 2019, Kaye appeared at Bespoke's offices for the meeting. Kaye brought with him a desktop computer from his home, and provided Bespoke the password for a laptop that was already at Bespoke's offices, so that the two devices could be submitted to a third-party vendor for forensic analysis.

73.     Despite his prior agreement to do so, Kaye refused to provide Bespoke with his cell phone or with the password for his iCloud account for independent forensic analysis. Instead, Kaye stated that he would enter the password on his phone and allow Bespoke to view its contents while he was at Bespoke's offices, but that he would not allow any access to his iCloud account or any of his text messages.

74.     Bespoke explained to Kaye that this option was insufficient because a third-party forensic analysis of all of his devices and his iCloud account was necessary to determine what he still had access to and what had been transferred to his iCloud account. Nevertheless, Kaye would not comply.

75.     Upon information and belief, Kaye deliberately tampered with the devices that he did provide for forensic analysis so that it would facially appear that he had not taken confidential information and documents from Bespoke.

76.     For instance, Bespoke's third-party vendor determined that Kaye's desktop computer had been wiped of any data and reset to its factory settings on November 8, 2019 – the very same day that he brought it to Bespoke's offices for forensic analysis, and the same day that Bespoke's counsel issued a litigation hold letter demanding that all relevant electronic information be preserved.

16

77.    In addition, the laptop that Kaye had left at Bespoke's offices had not been used since early March 2019, and thus a forensic analysis of that device could not be used to determine whether Kaye had taken any confidential documents from Bespoke during the following eight months leading up to his termination.

78.    Nevertheless, Kaye almost certainly retained nearly all of Bespoke's most confidential and competitively sensitive documents on his iCloud account, or on other devices. Upon information and belief, this is the reason why Kaye refused to provide his cell phone or his iCloud password to Bespoke for forensic analysis.

79.    Indeed, even if Kaye had deleted the documents that he improperly retrieved and/or retained from Bespoke off of his personal computers, he would continue to have access to them because they were synced or transferred to his iCloud account and/or to his personal email account.

80.    Kaye also easily could have transferred the documents to his cell phone or other devices through his iCloud account, his personal email account, or otherwise.

81.    Furthermore, upon investigation of Bespoke's computer system, it was discovered that Kaye had deleted virtually all of the documents that he created for or on behalf of Bespoke over the course of his independent contractor relationship.

82.    The documents that Kaye deleted are of significant value to Bespoke, as they contain information that is important to Bespoke's business generation efforts.

17

83.     Upon information and belief, Kaye maintained copies of the documents that he deleted from Bespoke's computer system on his own personal devices, email account, and/or iCloud account.

84.     Upon information and belief, Kaye deleted those documents from Bespoke's computer system with the intent to deprive Bespoke of the value of the work that he performed in accordance with the Contractor Agreement, and/or to use the documents to unfairly compete with Bespoke.

Kaye Uses or Discloses Bespoke's Confidential
Information and Trade Secrets and
Otherwise Interferes with Its Business Relationships

85.     In December 2019, Kaye began working with a real estate broker who is a competitor of Bespoke in the Hamptons market.

86.     Upon information and belief, this broker had been actively trying to recruit Kaye prior to his termination.  Kaye received phone calls during working hours from the broker on more than one occasion, and Kaye told multiple Bespoke employees that he was being heavily courted.

87.     Upon information and belief, the broker recruited Kaye specifically because he wanted to gain access to Bespoke's confidential information and trade secrets.  Indeed, because Kaye has little to no experience as a real estate agent, he would have extremely limited value to the broker unless he were able to provide the broker access this information.

88.     Upon information and belief, Kaye has, in fact, already begun to use or disclose Bespoke's confidential information and trade secrets for the benefit of himself and/or his new broker.

89.     Specifically, following his termination, Kaye has contacted multiple existing and prospective Bespoke clients, including a potential buyer for a major Hamptons listing, and has attempted to steer those clients away from Bespoke and to his new broker.

90.     Upon information and belief, Kaye was able to gain access to these existing and prospective clients only because of the significant non-public information that Bespoke compiled, which he improperly retrieved and/or retained.

91.     Bespoke has also inferred from Kaye's conduct – specifically, his statement that he will be "taking everything" and his refusal to provide complete access to his devices and iCloud account for analysis – that he intends to continue to disclose Bespoke's confidential information and trade secrets to its competitors in order to harm Bespoke's business and/or to seek a commercial advantage for himself.

92.     Furthermore, upon information and belief, Kaye has been communicating with independent real estate agents affiliated with Bespoke and attempting to convince them to stop referring clients to Bespoke and to refer them to his new broker instead.

## FIRST CAUSE OF ACTION

93.     Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

19

94.    The documents that Defendants wrongfully retrieved and/or retained from Bespoke are trade secrets subject to protection under the Defend Trade Secrets Act.

95.    The documents that Defendants wrongfully retrieved and/or retained from Bespoke contain information that derives independent economic value by not being generally known or readily ascertainable to Bespoke's competitors, who can obtain economic value from their disclosure or use.

96.    Bespoke takes measures that are reasonable under the circumstances to protect the secrecy of the information contained in the documents that Defendants wrongfully retrieved and/or retained from Bespoke.

97.    Defendants gained access to Bespoke's confidential information and trade secrets under circumstances giving rise to a duty to maintain their secrecy. Defendants knew about this duty in light of the explicit language and protections of the Contractor Agreement and the Covenant Agreement.

98.    The confidential information and trade secrets are related to products or services used or intended for use in interstate or foreign commerce.

99.    Specifically, the confidential information and trade secrets are used to advertise across state lines and to market real estate toward clients who reside in other states and in foreign nations. Bespoke also sends materials to and provides transportation services for clients residing outside the State of New York in connection with the viewing of properties in the Hamptons.

20

100.    Moreover, Bespoke uses its confidential information and trade secrets in connection with the marketing, sale, and purchase of properties in other states and in foreign nations.

101.    Upon information and belief, Defendants intend to misappropriate, or already have misappropriated, the confidential information and trade secrets by using and/or disclosing it for the benefit of themselves and/or a competitor of Bespoke.

102.    Defendants' actions were willful and malicious and intended to harm Bespoke.

103.    As a direct and proximate result of the foregoing, Bespoke stands to suffer, has suffered, and/or will continue to suffer damages in an amount to be determined at trial, which is believed to far exceed $1,500,000.

104.    Based on the above, Bespoke is entitled to injunctive relief, as well as an award of compensatory damages, exemplary damages, and attorney's fees and costs pursuant to 18 U.S.C. § 1836(b)(3).

105.    Bespoke is also entitled to an Order, pursuant to 18 U.S.C. § 1836(b)(2), providing for the seizure of any devices or accounts in Defendants' possession, custody, or control that contain Bespoke's confidential information and trade secrets, in order to prevent Defendants from any further use or disclosure of the same.

## SECOND CAUSE OF ACTION

106.    Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

21

107.    The documents that Defendants wrongfully retrieved and/or retained from Bespoke contain information that was developed by Bespoke through substantial effort and derives independent economic value by not being generally known or readily ascertainable to Bespoke's competitors, who can obtain economic value from its disclosure or use.

108.    Bespoke takes measures that are reasonable under the circumstances to protect the secrecy of the information contained in the documents that Defendants wrongfully retrieved and/or retained from Bespoke.

109.    Defendants gained access to Bespoke's confidential information and trade secrets under circumstances giving rise to a duty to maintain their secrecy. Defendants knew about this duty in light of the explicit language and protections of the Contractor Agreement and the Covenant Agreement.

110.    Upon information and belief, Defendants intend to misappropriate, or already have misappropriated, the confidential information and trade secrets by using and/or disclosing it for the benefit of themselves and/or a competitor of Bespoke.

111.    Defendants' actions constitute a misappropriation of trade secrets under New York law.

112.    As a direct and proximate result of the foregoing, Bespoke stands to suffer, has suffered, and/or will continue to suffer damages in an amount to be determined at trial, which is believed to far exceed $1,500,000.

113.    Bespoke is also entitled to an injunction (a) prohibiting Defendants from using or disclosing Bespoke's confidential information and trade secrets; and (b) mandating that Kaye

22

submit to a full forensic analysis of all of his devices and his iCloud account to ensure that Defendants no longer have possession, custody, or control of any confidential information and documents that they wrongfully retrieved and/or retained from Bespoke.

### THIRD CAUSE OF ACTION

114. Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

115. The Contractor Agreement and the Covenant Agreement are valid and enforceable contracts that are binding upon Defendants.

116. Bespoke materially complied with its obligations under the Contractor Agreement and the Covenant Agreement.

117. Defendants breached the Contractor Agreement and the Covenant Agreement by, among other things, (a) improperly retrieving and/or retaining documents containing Bespoke's confidential information and trade secrets through Kaye's personal email and iCloud accounts; (b) retaining Bespoke's confidential information and trade secrets after being asked to return them to Bespoke following their termination; (c) improperly using, disclosing, and/or threatening to use or disclose Bespoke's confidential information and trade secrets for the benefit or themselves and/or a competitor of Bespoke; (d) continuously syncing all files on Kaye's Bespoke computer to his personal iCloud account; (e) conducting real estate business on behalf of Bespoke using a personal email account, rather than the email account provided to Kaye on Bespoke's email platform; (f) refusing to allow Bespoke management to inspect all of Kaye's devices and his iCloud account in order to affect the removal of all of Bespoke's confidential

23

information and trade secrets; and (g) deleting substantially all of the documents that they created for or on behalf of Bespoke over the course of their independent contractor relationship.

118.    As a direct and proximate result of the foregoing breaches, Bespoke stands to suffer, has suffered, and/or will continue to suffer damages in an amount to be determined at trial, which is believed to far exceed $1,500,000.

119.    Bespoke is also entitled to an injunction (a) prohibiting Defendants from using or disclosing Bespoke's confidential information and trade secrets; and (b) mandating that Kaye submit to a full forensic analysis of all of his devices and his iCloud account to ensure that Defendants no longer have possession, custody, or control of any confidential information and documents that they wrongfully retrieved and/or retained from Bespoke.

## FOURTH CAUSE OF ACTION

120.    Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

121.    Upon information and belief, Defendants has been unjustly enriched, at Bespoke's expense, from their retention, use, and/or disclosure of Bespoke's confidential information and trade secrets.

122.    It is against equity and good conscience to permit Defendants to retain the amounts in which they have been enriched.

123.    As a result of the foregoing, Bespoke is entitled to damages, in an amount to be determined at trial, which is believed to far exceed $1,500,000.

24

## FIFTH CAUSE OF ACTION

124.    Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

125.    Bespoke has a business and/or contractual relationship with numerous clients, and significant data regarding those clients is contained in the documents that Defendants wrongfully retrieved and/or retained from Bespoke.

126.    Upon information and belief, Defendants intend to use, or have already used, Bespoke's confidential data in order to contact its existing and prospective clients and to steer their business away from Bespoke.

127.    Furthermore, upon information and belief, Defendants have contacted independent agents affiliated with Bespoke in an effort to persuade them to stop referring clients to Bespoke.

128.    Defendants acted solely out of malice and/or used dishonest, unfair, or improper means to retrieve Bespoke's client data and to interfere with its existing and prospective business and/or contractual relationships.

129.    As a direct and proximate result of the foregoing, Bespoke stands to suffer, has suffered, and/or will continue to suffer damages in an amount to be determined at trial, which is believed to far exceed $1,500,000.

## SIXTH CAUSE OF ACTION

130.    Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

5485068v.16

131.    Upon information and belief, Defendants intend to use, or have already used, Bespoke's confidential information and trade secrets in order to compete with Bespoke and/or to assist Bespoke's competitors in competing with Bespoke.

132.    In doing so, Defendants acted with bad faith to exploit the substantial expenditures and labor of Bespoke.

133.    Defendants' conduct constitutes unfair competition under New York law.

134.    As a direct and proximate result of the foregoing, Bespoke stands to suffer, has suffered, and/or will continue to suffer damages in an amount to be determined at trial, which is believed to far exceed $1,500,000.

## SEVENTH CAUSE OF ACTION

135.    Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

136.    New York law holds that an independent contractor is prohibited from acting in any manner inconsistent with his agency or trust and is, at all times, bound to exercise the utmost good faith and loyalty in the performance of his duties.

137.    An independent contractor who breaches his duty of good faith and loyalty must account to his principal for secret profits earned during the independent contractor period, which profits would have otherwise been realized by the principal, and forfeits his right to compensation for services rendered on behalf of the principal during the period of disloyalty.

26

138.    Defendants breached their duty of loyalty to Bespoke by, among other things (a) secretly collecting Bespoke's confidential information and trade secrets through Kaye's own personal email and iCloud accounts; (b) using, disclosing, and/or threatening to use or disclose Bespoke's confidential information and trade secrets in order to improperly compete with Bespoke for business; (c) deleting substantially all of the documents that they created for or on behalf of Bespoke over the course of their independent contractor relationship, while maintaining copies of the same for their own use and benefit; and (d) depriving Bespoke of profits that it would have realized absent Defendants' misconduct.

139.    As a result of the foregoing, Defendants must forfeit any and all secret profits that they received over the course of their independent contractor relationship with Bespoke.

140.    Defendants must also forfeit all compensation paid to them by Bespoke, including any SOW fees and commissions, during their period of disloyalty.

141.    Based on the above, Bespoke is entitled to damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

142.    Bespoke repeats and reiterates each of the foregoing allegations as if they were fully set forth herein.

143.    Upon information and belief, Defendants intentionally deleted substantially all of the documents that they created for on behalf of Bespoke during the course of their independent contractor relationship.

27

5485068v.16

144.    Upon information and belief, Defendants have maintained copies of those documents on Kaye's own personal devices, email account, and/or iCloud account.

145.    Under the Contractor Agreement and the Covenant Agreement, the documents that Defendants created in connection with their independent contractor relationship are the sole and exclusive property of Bespoke.

146.    Defendants' interference with these documents was to the exclusion of the rights of Bespoke as the owner of the documents.

147.    Defendants' actions demonstrate a malicious, wanton, and reckless disregard of Bespoke's rights.

148.    As a result of Defendants' conversion of documents, Bespoke has suffered damages in an amount to be determined at trial.

149.    Bespoke is also entitled to an award of punitive damages, in an amount to be determined at trial.

## **DEMAND FOR RELIEF**

Wherefore, Plaintiffs Bespoke Real Estate LLC and Bespoke Luxury Marketing LLC demand judgment:

(a)    Awarding Bespoke compensatory damages in an amount to be determined at trial, which is believed to far exceed $1,500,000, plus pre-judgment interest thereupon;

(b)    Awarding Bespoke exemplary and punitive damages;

28

5485068v.16

(c)    Granting an injunction (i) prohibiting Defendants Preston Kaye and Lake Farm Group Inc. from using or disclosing Bespoke's confidential information and trade secrets, and (ii) mandating that Kaye submit to a full forensic analysis of all of his devices and his iCloud account to ensure that Defendants no longer have possession, custody, or control of any confidential information and documents that they wrongfully retrieved and/or retained from Bespoke;

(d)    Granting an Order, pursuant to 18 U.S.C. § 1836(b)(2), providing for the seizure of any devices or accounts in the possession, custody, or control of Defendants Preston Kaye and Lake Farm Group, Inc. that contain Bespoke's confidential information and trade secrets.

(e)    Awarding Bespoke the costs and attorney's fees that it incurred in litigating this action; and

(f)    Affording Bespoke such other and further relief as the Court deems equitable, just, or proper.

## JURY DEMAND

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Bespoke Real Estate LLC and Bespoke Luxury Marketing LLC demand a trial by jury on all issues so triable.

29

5485068v.16

Dated: Great Neck, New York
      January 24, 2020

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiffs*


By:          */s/ Justin M. Vogel*
                Justin M. Vogel
                Marc A. Sittenreich
                Mickey Keane
111 Great Neck Road
Great Neck, New York  11021
(516) 393-2200

TO:     PRESTON KAYE
        74 Main Street, #4
        Sag Harbor, New York 11963

        LAKE FARM GROUP INC.
        76 Whooping Hollow Road
        East Hampton, New York 11937

30